IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 15-cv-00482-PAB-NYW

FREDDRICK MOORE,

      Plaintiff,

v.

STADIUM MANAGEMENT COMPANY, LLC,
TOM SHERWOOD, Denver Police Officer, in his official and individual capacity,
RAUL VELASQUEZ, Denver Police Officer, in his official and individual capacity,
TONY LOPEZ, Denver Police Officer, in his official and individual capacity, and
COMMANDER RON THOMAS, Denver Police Officer, in his official and individual
capacity,

      Defendants.

_____

**ORDER**
_____

This matter comes before the Court on (1) the Motion to Dismiss Amended

Complaint Under Fed. R. Civ. P. 12(b)(6) [Docket No. 41] filed by defendant Stadium

Management Company, LLC ("SMC") and (2) the Motion to Dismiss [Docket No. 54]

filed by defendants Tom Sherwood, Raul Velasquez, Tony Lopez, and Ron Thomas

(the "Denver police defendants").  The Court has jurisdiction pursuant to 28 U.S.C.

§ 1331.

## I. BACKGROUND[1]

This case concerns two incidents in January 2014 in which plaintiff was ordered

to remove his Winnebago motor home from a parking lot at Sports Authority Field in

_____

[1]The following facts are drawn from plaintiff's Amended Complaint, Docket No. 33, and
are assumed to be true for the purposes of the present motion.  *See Alvarado v. KOB-
TV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007).

Denver, Colorado.  *See generally* Docket No. 33 at 4-6, ¶¶ 17-29.  Although this case

has an extensive procedural history involving lawsuits filed at the state court level by

different plaintiffs concerning the same events, *see generally* Docket No. 11-1, the

Court recites only those facts that are relevant to resolving the instant motions to

dismiss.[2]

### A.  SMC, PDB, and the District

The Metropolitan Football Stadium District (the "District") is a political subdivision

of the State of Colorado.  Docket No. 33 at 3, ¶ 11.  The District was established

pursuant to the Metropolitan Football Stadium District Act, Colo. Rev. Stat. § 32-15-101

*et seq.*  According to its website,[3] the District "was created for the purpose of planning,

acquiring land and constructing a professional football stadium."  *See* http://mfsd.com/

(last visited March 7, 2016).  The District owns Sports Authority Field and its adjacent

parking lots.  Docket No. 33 at 10, ¶ 54.

SMC, a Colorado limited liability company, is an affiliate of PDB, which does

business as the Denver Broncos Football Club.  Docket No. 33 at 3-4, ¶¶ 10, 12.  PDB

leases Sports Authority Field and its adjacent parking lots, including parking lot C, from

---

[2]The amended complaint was originally brought by two plaintiffs, Raynard Hugee and Freddrick Moore, and named as defendants the Metropolitan Football Stadium District, PDB Sports Ltd., d/b/a Denver Broncos Football Club ("PDB"), SMC, and the Denver police defendants.  *See* Docket No. 33.  On June 22, 2015, the Court dismissed PDB and the District pursuant to an agreement reached by the parties.  *See* Docket No. 37. On November 18, 2015, the Court granted Mr. Hugee's motion to dismiss.  *See* Docket No. 80.  Thus, only Mr. Moore, SMC, and the Denver police defendants remain as parties to this action.

[3]The Court may take judicial notice of the contents of an agency's website.  *See, e.g., Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005).

the District.  *Id.* at 3, ¶ 10.  Sports Authority Field, the stadium where the Denver

Broncos play their home games, is the single largest event venue in the State of

Colorado.  *Id.* at 8, ¶ 37.  A Lease and Management Agreement (the "agreement")

entered into by the District and PDB in 1998 provides that SMC may perform operation

and management of the premises.  *Id.* at 10, ¶ 55.  The agreement obligated the District

to contribute 75% of the total budget for the construction of Sports Authority Field up to

a maximum of $270 million.  *Id.* at 10-11, ¶ 58.  The agreement states that "[a]ny

Stadium security system and parking plan developed by PDB shall not cause

unreasonable interference with the ingress and egress of any of the District's

employees, agents, or representatives to and from the Leased Premises, necessary for

the District to perform all of its operations, except on the days of scheduled events."  *Id.*

at 11, ¶ 62.  The agreement also requires the District to contribute annual payments

"aggregating more than $2,000,000.00 (as of the year 2013) from PDB's rent payments

to a 'Capital Replacement Fund'" that is used to fund work that is reasonably necessary

for the premises' upkeep.  *Id.* at 11-12, ¶ 63.  Any capital replacements require the

concurrence of both the District and PDB, except that PDB is permitted to make capital

replacements without District approval in emergency situations or if required by the

National Football League.  *Id.* at 12, ¶ 64.

### B. The Alleged Constitutional Deprivations

On January 12, 2014, plaintiff, as well as a number of individuals who are not parties to this action, were "tailgating" from plaintiff's Winnebago[4] in parking lot C of Sports Authority Field in anticipation of the Denver Broncos' playoff game against the San Diego Chargers. Docket No. 33 at 4, ¶ 17. The phrase "Cannabis University" was emblazoned on the Winnebago's driver and passenger sides. *Id.* at 5, ¶ 19. Before the football game started, agents of SMC and the Denver Police Department, including defendants Sherwood and Velasquez, ordered the Winnebago's occupants to either immediately cover the word "cannabis" on the vehicle or remove the vehicle from Sports Authority Field property. *Id.* ¶ 23.

On January 19, 2014, plaintiff again sought to park the Winnebago in parking lot C, but had covered both areas of the vehicle that displayed the phrase "Cannabis University." *Id.* at 6, ¶ 26. Agents of SMC and the Denver Police Department, including defendants Lopez and Thomas, refused to let the Winnebago enter lot C and demanded that it immediately leave Sports Authority Field property. *Id.* ¶ 27.

Plaintiff alleges that the Denver police defendants and SMC conspired to eject the Winnebago from Sports Authority Field on January 12 and January 19 "for the bogus reason that all commercial activity is prohibited on stadium land." Docket No. 33 at 7, ¶ 32. Plaintiff alleges that this ban on commercial activity is selectively enforced

---

[4]The Winnebago belonged to two entities of which plaintiff is 100% owner, Docket No. 33 at 4 n.1. Plaintiff, however, refers to the vehicle as his own. *See id.* at 5, ¶ 18. For simplicity's sake, the Court will do the same.

and that "a wide variety of other, non-cannabis-related political and commercial speech and expressive images" was permitted on stadium land, including in parking lot C.  *Id.* ¶ 33.

Parking lot C is adjacent to the southwest corner of Sports Authority Field.  *Id.* at 8, ¶ 38.  The parking lot is also adjacent to a pedestrian walkway that leads to a major entrance to Sports Authority Field.  *Id.* ¶ 39.  Pedestrians are free to enter and tailgate in parking lot C without paying a fee and without having a ticket to enter the stadium, *id.* ¶ 40, and, although there are fences at vehicular access points, there are no gates or fences that separate parking lot C from the public street and sidewalk adjacent to the parking lot and there are no signs that state that parking lot C is not generally open to the public.  *Id.* ¶¶ 41-42.

Plaintiff states that Cannabis University's "core mission" is to "change hearts and minds by joining the robust business community of physicians, attorneys, retail merchants, media, and caregivers in contributing to the acceptance of marijuana after a century of negative images associated with it and its users."  *Id.* ¶ 43.  Plaintiff alleges that Cannabis University regularly posts political commentary and news on its blog and "educates its readers about the cultivation, production, health benefits of, and safe consumption of marijuana-related products."  *Id.* at 8-9, ¶ 44.  Cannabis University also sells cannabis-related services, texts, and apparel.  *Id.* at 9, ¶ 45.

Plaintiff brings two claims pursuant to 42 U.S.C. § 1983, one for violations of the First and Fourteenth Amendments to the United States Constitution, and one for

violation of the Fourteenth Amendment to the United States Constitution and Article II, Section 10 of the Colorado Constitution. *See generally* Docket No. 33 at 13-15.

## II.  STANDARD OF REVIEW

The Court's function on a Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is sufficient to plausibly state a claim.  Fed. R. Civ. P. 12(b)(6); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations omitted).  A district court may take into account "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Alvarado*, 493 F.3d at 1215 (citation and quotation marks omitted).

The "plausibility" standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves are plausible.  *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008).  However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotation marks and alteration marks omitted).

## III.  ANALYSIS

### A.  SMC's Motion to Dismiss

Under 42 U.S.C. § 1983, persons acting under the color of state law can be held liable for depriving others of their constitutional rights.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970).  In order to show that an action was taken under color of

state law, a plaintiff must show: (1) that the "alleged constitutional deprivation [was]

'caused by the exercise of some right or privilege created by the State or by a rule of

conduct imposed by the State or by a person for whom the State is responsible,'" and

(2) that the "party charged with the deprivation [was] a person who may fairly be said to

be a state actor." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (quoting

*Lugar v. Edmondson Oil Co., Inc.*, 475 U.S. 922, 937 (1982)).

The Court first considers whether plaintiff has sufficiently pled that SMC is a state

actor.  In order to determine whether a private party, such as SMC, can be considered a

state actor under § 1983, a court may apply a variety of factors depending on the facts

of each case.  *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir.

1995).  Under the nexus test, a plaintiff must allege "a sufficiently close nexus between

the State and the challenged action of the regulated entity so that the action of the latter

may be fairly treated as that of the State itself." *Id.* (quotation and citation omitted).

Under the joint action test, a plaintiff must show that a private party is "a willful

participant in joint activity with the State or its agents." *Adickes*, 398 U.S. at 152

(citation and quotation omitted).  Under the symbiotic relationship test, the plaintiff must

show that "the state has 'so far insinuated itself into a position of interdependence' with

the private party that there is a symbiotic relationship between them." *Gallagher*, 49

F.3d at 1447 (citing *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961)).

Under the public function test, a plaintiff must show that a private party exercised

"powers traditionally exclusively reserved to the State."  *Jackson v. Metropolitan Edison

Co.*, 419 U.S. 345, 352 (1974) (citations omitted).  The question asked by each test is

whether "the conduct allegedly causing the deprivation of a federal right [is] fairly attributable to the State." *Lugar*, 457 U.S. at 937.  Defendants argue that plaintiff cannot satisfy any of the four tests under which a private party can be considered a state actor for § 1983 purposes.

### 1.  Joint Action and Nexus Tests

Plaintiff argues that his allegations that SMC "conspired and acted in concert" with the Denver police defendants to exclude plaintiff's Winnebago from the parking lot satisfy both the joint action and nexus tests.  Docket No. 46 at 9-11; *see also id.* at 11 n.5.  Because plaintiff claims that he satisfies both tests due to this supposed concerted activity, the Court considers the two tests together.

The Tenth Circuit recognizes two approaches that courts may employ to determine whether a private actor satisfies the joint action test.  The first approach uses "the requirements for establishing a conspiracy under Section 1983," which requires that "both public and private actors share a common, unconstitutional goal."  *Gallagher*, 49 F.3d at 1454 (citing *Cunningham v. Southlake Ctr. for Mental Health, Inc.*, 924 F.2d 106, 107 (9th Cir. 1991)).  The second approach holds that state action is present if there is a "substantial degree of cooperative action" or if there is "overt and significant state participation" in "carrying out the deprivation of the plaintiff's constitutional rights."  *Id.* (citation and quotation omitted).  Under either approach, "the focus of this test is not on long-term interdependence between the state and a private entity.  Instead, courts examine whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights."  *Id.* at 1453.

8

Plaintiff argues that the amended complaint satisfies the joint action test because it "alleges with particularity" that agents of SMC "conspired and acted in concert" with officers of the Denver Police Department to violate his constitutional rights.  Regarding the January 12 incident, plaintiff alleges:

- before the football game started, agents of SMC and the Denver Police Department ordered the Winnebago's occupants to cover the word "cannabis" or to remove the Winnebago from Sports Authority Field property.  Docket No. 33 at 5, ¶ 23; and

- defendants Sherwood and Velasquez "conspired and acted in concert" with "at least three agents of SMC" to "effectuate the ejection of the Cannabis University Winnebago from stadium land . . . based on the content and viewpoint of its speech." *Id.* at 5-6, ¶ 25.

Regarding the January 19 incident, plaintiff alleges:

- Plaintiff covered the phrase "Cannabis University" on the Winnebago. *Id.* at 6, ¶ 26; and

- Defendants Lopez and Thomas "conspired and acted in concert" with agents of SMC, "refused to let the Cannabis University Winnebago even enter parking lot 'C,'" and "demanded that the Winnebago immediately leave Sports Authority Field property at the threat of being towed, solely because the Winnebago and its occupants were *associated* with cannabis." *Id.* ¶ 27 (emphasis in original).

Concerning both incidents, plaintiff alleges that the Denver police defendants and SMC "conspired and acted in concert to eject the Winnebago from Sports Authority Field property . . . for the bogus reason that all commercial activity is prohibited on stadium land." *Id.* at 7, ¶ 32.

"[W]hen a plaintiff in a § 1983 action attempts to assert the necessary 'state action' by implicating state officials or judges in a conspiracy with private defendants, mere conclusory allegations with no supporting factual averments are insufficient; the

pleadings must specifically present facts tending to show agreement and concerted action." *Hunt v. Bennett*, 17 F.3d 1263, 1268 (10th Cir. 1994) (quoting *Sooner Products Co. v. McBride*, 708 F.2d 510, 512 (10th Cir. 1983)); *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1126 (10th Cir. 2000) (affirming summary judgment where the plaintiff "failed to present sufficient evidence of agreement and concerted action"); *Martinez v. Winner*, 771 F.2d 424, 445 (10th Cir. 1985) (dismissing § 1983 conspiracy claim where plaintiff made only "the bare conclusory allegation that [defendant], a private citizen, conspired with the other defendants to deprive plaintiff of his constitutional and civil rights").

Contrary to plaintiff's assertion that he pled facts "with particularity," Docket No. 46 at 9,  the only details alleged in the amended complaint beyond the bare legal conclusion that SMC "conspired and acted in concert" with state actors are the names of the SMC employees and Denver police officers who were present on the days in question.  *See* Docket No. 33 at 5-6, ¶¶ 25, 27.  Plaintiff does not differentiate between the actions of SMC and the Denver police defendants and provides no description of which defendants personally spoke to plaintiff, or the specific role played by SMC and the Denver police defendants in the disputed incidents.  Plaintiff also does not describe the actions of any defendant with particularity, explain whether SMC or the Denver police defendants acted first, or whether the Denver police defendants spoke with SMC agents or heard each other speak during the incidents.  Plaintiff's allegations fall short of the requirements for either of the approaches to the joint action test recognized in *Gallagher*.  Plaintiff does not allege any specific action taken by an SMC agent or a

Denver police officer that evidences that any of the defendants "share[d] a common,

unconstitutional goal." *Gallagher*, 49 F.3d at 1454.  Nor does plaintiff identify any action

by any of the Denver police defendants that demonstrates a "substantial degree of

cooperative action" or "overt and significant state participation." *Id.*  Plaintiff alleges only

that SMC and the Denver police defendants "ejected" the Winnebago.  Docket No. 33 at

7, ¶ 32.  This allegation lacks any supporting facts showing either the reasons for the

alleged conspiracy or direct cooperation between the Denver police defendants and

SMC.

Plaintiff's attempt to analogize the allegations in the amended complaint to *Lusby*

*v. T.G. & Y. Stores, Inc.*, 749 F.2d 1423 (10th Cir. 1984), *vacated on other grounds*, *City*

*of Lawton, Okla. v. Lusby*, 474 U.S. 805 (1985), and *Coleman v. Turpen*, 697 F.2d 1341

(10th Cir. 1982) (per curiam), is unpersuasive.  In *Lusby*, the Tenth Circuit held that a

security guard who reported a suspected shoplifter to the police was a state actor where

the police "made no independent investigation" of the shoplifting before arresting the

suspect.  749 F.2d at 1430.  In *Coleman*, the plaintiff, who had previously been

convicted of murder, brought a § 1983 claim against a sheriff, a prosecutor, and an

automobile wrecking company.  697 F.2d at 1343.  The plaintiff alleged that the sheriff's

department had hired the wrecking company to tow and store the plaintiff's camper and

tools, which were plaintiff's rightful property, and incurred a substantial storage bill.  *Id.*

Some time after the plaintiff's conviction, the wrecking company sold the camper and

tools to satisfy the sheriff's department's storage bill, thus permanently divesting plaintiff

of his property.  *Id.*  The Tenth Circuit held that, since the state asserted a right to

maintain possession of the plaintiff's property, the plaintiff had plausibly alleged that the wrecking company "jointly participated" with the state in seizing the plaintiff's truck, towing it away, and eventually selling it.  *Id.* at 1345.

Plaintiff argues that this case is similar to *Lusby* in that "the allegations [in the amended complaint] do not state or suggest the DPD Defendants made an independent decision to engage in the challenged conduct."  Docket No. 46 at 10 (emphasis in original) (quotation and citation omitted).  Plaintiff is correct that there are no such allegations, but only because plaintiff does not allege with particularity what any of the Denver police defendants did during the incidents at issue.  Plaintiff cannot rely on the vagueness of his allegations to create an inference that the actions of the Denver police defendants – whatever they may have been – were not a result of their independent judgment.  To state a claim that SMC was a joint actor with state officials, plaintiff must "specifically present facts tending to show agreement and concerted action."  *Hunt*, 17 F.3d at 1268.  Plaintiff has failed to do so.  Plaintiff pleads only the identity of the officers present and the legal conclusion that they conspired with SMC to deprive plaintiff of a Constitutionally-protected right.

Plaintiff's argument that this case is analogous to *Coleman* is similarly misplaced. Plaintiff makes no attempt to draw factual similarities between this case and *Coleman*. In *Coleman*, a private wrecking company was found to be a state actor because the company, on orders from a state agency, seized the plaintiff's property and then, after the state incurred a debt to the wrecking company, sold that property.  *Id.*  Plaintiff alleges no analogous direct relationship between SMC and the Denver police

defendants that could lead to the conclusion that SMC and the Denver police defendants were joint actors.

For the same reason, the Court finds that plaintiff's allegations do not satisfy the nexus test. With respect to the nexus test, "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). "[T]he fact that a private entity contracts with the government" or the "mere approval of or acquiescence in the initiatives of a private party" are not sufficient. *Gallagher*, 49 F.3d at 1448. As discussed above, plaintiff's identification of the police officers present and the legal conclusions that they "conspired and acted in concert" with SMC agents, Docket No. 33 at 5-6, ¶¶ 25, 27, are insufficient to show such coercive power or significant encouragement.

### 2. *Symbiotic Relationship Test*

The essence of the symbiotic relationship test is whether "the state has so far insinuated itself into a position of interdependence with a private party that it must be recognized as a joint participant in the challenged activity." *Gallagher*, 49 F.3d at 1451 (citation and quotation omitted). Plaintiff argues that several provisions of PDB's contract with the District demonstrate that the District and SMC are interdependent. Docket No. 46 at 6-7. Specifically, plaintiff points to its allegations that (1) the District agreed to contribute 75% to the total project budget for Sports Authority Field up to $270 million, Docket No. 46 at 6; (2) the agreement provides that "[a]ny Stadium

security system and parking plan developed by PDB shall not cause unreasonable interference with the ingress and egress of any of the District's employees, agents, or representatives to and from the Leased Premises, necessary for the District to perform all of its operations, except on the days of scheduled events," *id.* at 6-7; (3) the agreement requires the District to make annual payments totaling more than $2 million to a "Capital Replacement Fund," *id.* at 7; (4) the agreement provides for yearly meetings between the District and PDB to agree on any capital replacements that are to be made to the stadium that year, *id.*; and (5) the agreement gives District employees privileges, including the right to use office space on stadium land and to park in stadium parking lots free of charge. *Id.; see also* Docket No. 33 at 10-12, ¶¶ 58, 60-64.

Notably absent from plaintiff's argument is any reference to an allegation in the complaint that demonstrates interdependence between the District and SMC, as opposed to PDB. With respect to SMC, the amended complaint alleges only that the agreement between PDB and the District authorizes SMC to perform the operation and management of the Sports Authority Field premises and that SMC is "an affiliate of PDB." Docket No. 33 at 10, ¶ 55. Plaintiff has identified no allegation that suggests that the District is directly involved with or oversees the manner in which SMC carries out its operational and management functions. Absent any such allegation, plaintiff has not adequately pled that the relationship between SMC and the District is symbiotic.

The case that plaintiff cites to support its claim that the entities are interdependent, *Milo v. Cushing Mun. Hosp.*, 861 F.2d 1194 (10th Cir. 1988), does not compel a contrary result. In *Milo*, the Tenth Circuit examined whether a municipal

hospital was "public or private." *Id.* at 1196.  The city had established a public trust to

oversee the hospital, and the trust had contracted with a private corporation, the

Masonic Hospital Association, to operate the hospital.  *Id. at* 1195.  The hospital's

governing board consisted of three city commissioners and two officials from the private

corporation.  *Id.* at 1196.  The court held that "[t]he private defendants cannot receive

public funds, utilize public facilities, and serve a public purpose, yet insist that their

private status forestalls any connection [to] a violation of the constitutional rights of their

medical staff." *Id.* (quoting *Jatoi v. Hurst-Euless-Bedford Hosp. Auth.*, 807 F.2d 1214 ,

1221-22 (5th Cir. 1987), *cert. denied*, 484 U.S. 1010 (1988)).  The Tenth Circuit,

however, has declined to extend *Milo* to any situation where an agency delegates

operation of a publicly-owned facility to a private company.  In *Gallagher*, the Tenth

Circuit found that a public university's lease of university property to a private entity that,

in turn, hired a company to provide security and crowd management services did not

create a symbiotic relationship between the university and the security company.  49

F.3d at 1452.  In distinguishing *Milo*, the Tenth Circuit noted that the government actors

and private company in *Milo* were "functionally intertwined," particularly due to the

presence of officials of the private company on the board of the hospital's governing

body.  *Id.*  Here, too, the Court finds that plaintiff has not demonstrated sufficient

functional intertwining to support a finding that SMC can be considered a state actor for

§ 1983 purposes.  Plaintiff has alleged no direct connection between SMC and the

District other than SMC's status as an "affiliate" of PDB.  While it may be true, as

plaintiff argues, that SMC and the District "both possess a financial stake in Stadium

Land's successful operation," Docket No. 46 at 8, a financial arrangement, standing alone, is not sufficient to satisfy the symbiotic relationship test.  *Gallagher*, 49 F.3d at 1453 (noting that the test is not satisfied by "economic benefits" to the government agency that "are indistinguishable from those that could be obtained through contracts generally").[5]

### 3. Public Function Test

The public function test asks whether a plaintiff has shown that a private party exercised "powers traditionally exclusively reserved to the State."  *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352 (1974).  "While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the state.'"  *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 158 (1978).  Plaintiff argues that he has done so because the Sports Authority Field parking lots "constitute a modern-day 'city park.'"  Docket No. 46 at 12; *see also Evans v. Newton*, 382 U.S. 296, 298-302 (1966) (finding that the management of a city park satisfies the public function test).  Plaintiff states that the parking lots are analogous to a city park "because they are open to the public, regularly attract scores of visitors, are conducive to expressive activity in an open space, and are owned by a public entity."  Docket No. 46 at 12 (citations to the

---

[5]Plaintiff also cites *Jatoi v. Hurst-Euless-Bedford Hosp. Auth.*, 807 F.2d 1214 (5th Cir. 1987), for the proposition that a direct financial benefit can satisfy the "symbiotic relationship" test.  Docket No. 46 at 8.  In *Gallagher*, however, the Tenth Circuit distinguished between situations where the government entities, like the hospital in *Jatoi*, "depended upon the private management company's successful operation of the hospital to repay its bonds and mortgages" and those that merely demonstrate some sort of financial arrangement.  49 F.3d at 1452.  Plaintiff does not allege that the District relies on SMC's successful operation or management sufficient to demonstrate a symbiotic relationship.

amended complaint omitted).  The Court disagrees.  The allegations on which plaintiff relies state that the parking lots are "open to the public" insofar as they are situated nearby public walkways and "[p]edestrians on foot are free to enter, leave, and tailgate in parking lot 'C' without paying any fee or having a ticket to enter Sports Authority Field" and there are no signs that indicate that parking lot "C" is not open to the public. Docket No. 33 at 8, ¶¶ 39-40, 42.  While pedestrians may have been permitted to enter the parking lot without paying a fee, the amended complaint acknowledges that vehicles were not.  *Id.* at 6, ¶ 28 (noting that the occupants of the Cannabis University Winnebago "wished to pay the applicable parking fee.").  The Court finds that operating and charging a fee for a parking lot that is accessible to pedestrians is neither analogous to managing a city park nor a function traditionally exclusively reserved to the state.

Plaintiff cites *Lewis v. Colo. Rockies Baseball Club, Ltd.*, 941 P.2d 266 (Colo. 1997), for the proposition that "constitutional free speech principles should – and do – regulate the conduct of . . . SMC."  Docket No. 46 at 13.  Although *Lewis* involves the same municipally-created district, the case is not relevant to whether SMC exercised powers traditionally exclusively reserved to the state.  In *Lewis*, the defendant, the Colorado Rockies Baseball Club, conceded that its actions "constitute state action such that the constitutional protection of free speech is implicated."  944 P.2d at 272.  Thus, the Colorado Supreme Court did not analyze whether the actions satisfied any of the recognized tests used to determine whether a private entity can be liable under § 1983. The court considered only whether the restrictions at issue were reasonable time, place,

and manner restrictions on speech.  *See id.* at 271-72.  Thus, *Lewis* has no bearing on the Court's analysis of whether plaintiff satisfies the public function test, or any other test for determining whether SMC can be considered a state actor for § 1983 purposes.

Because plaintiff has failed to allege that defendant SMC is a state actor under any applicable test, the Court need not address whether plaintiff's speech was protected by the First Amendment.

### B.  Denver Police Defendants' Motion to Dismiss

The Denver police defendants move to dismiss on several grounds, including that plaintiff has not alleged each police officer's personal participation in any deprivation of his rights, that plaintiff has not pled a violation of his clearly establish First Amendment rights, that plaintiff has not alleged a viable § 1983 claim under the Colorado Constitution or the Fourteenth Amendment, and that plaintiff has not successfully pled a claim against the Denver police defendants in their official capacities.  *See generally* Docket No. 54.  The Court first addresses whether plaintiff has sufficiently pled the personal participation of any of the Denver police defendants such that plaintiff can state a claim against them in their individual capacities.

Section 1983 "imposes liability for a defendant's own actions" and thus "personal participation in the specific constitutional violation complained of is essential."  *Henry v. Storey*, 658 F.3d 1235, 1241 (10th Cir. 2011) (citations omitted).  Section 1983 does not provide for vicarious liability.  *Iqbal*, 556 U.S. at 676.  A plaintiff must show that "each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Id.*

As discussed above, plaintiff alleges that, on January 12, Sergeant Sherwood and Officer Velasquez "conspired and acted in concert" with SMC agents to eject the Cannabis University Winnebago based on the content and viewpoint of its speech, Docket No. 33 at 5-6, ¶ 25, and that, on January 19, Officers Lopez and Thomas "conspired and acted in concert" with SMC in refusing to let the vehicle enter the parking lot because the vehicle and its occupants were associated with cannabis. *Id.* at 6, ¶ 27. Plaintiff argues that, because his claims against all defendants entail "very similar tortious acts," plaintiff can satisfy the requirement to plead each defendant's personal participation with a collective allegation. *See* Docket No. 59 at 5. The cases that plaintiff cites provide no support for this position. In *Mauchlin v. Davis*, No. 12-cv-01449-RM-BNB, 2014 WL 5069547, at *6 (D. Colo. Oct. 9, 2014), the court noted a "tension" between the requirement that a plaintiff plead § 1983 claims against officials in their individual capacity and the requirement that courts construe a pro se litigant's complaint liberally – a tension not present here, given that plaintiff has an attorney. The court explained that the plaintiff, who complained of unsanitary and excessively noisy conditions in his prison cells, made several "general allegations" pertaining to all defendants that, "[s]tanding alone . . . likely would be insufficient" to state a § 1983 claim for violation of the Eighth Amendment. *Id.* at *6. The court, however, identified specific allegations that the plaintiff made concerning each defendant and concluded that, when the general allegations were read together with the specific allegations, plaintiff had pled sufficient facts to state a § 1983 claim. *Id.* Here, plaintiff makes no such specific

allegations of personal participation that can buttress his general allegations that the

Denver police defendants "conspired and acted in concert" with SMC's agents.

    *Guion v. Spurlock*, No. 14-cv-00391-LTB-MEH, 2015 WL 394020 (D. Colo. Jan.

29, 2015), also provides no support for plaintiff's position.  In that case, the court

adopted a magistrate judge's recommendation that found an inmate plaintiff sufficiently

alleged a conspiracy to destroy the plaintiff's mail. *Id.* at *8-*9.  The plaintiff claimed that

one defendant picked up a letter from plaintiff's cell on a specific date and marked the

letter with a signal to mailroom staff to destroy the letter. *Id.*  The plaintiff identified two

defendants as the prison staff who "handled all incoming and outgoing mail" and were

the intended recipients of the signal. *Id.*  The plaintiff alleged that one of the two mail

handlers "destroyed or disrupted [plaintiff's] mail on certain specific dates in 2013." *Id.*

at *9.  The magistrate judge found that these allegations were specific enough to allege

the three defendants' personal participation. *Id.*  In the same case, however, the

magistrate judge found that the plaintiff had not properly alleged personal participation

with respect to another of his claims.  As to that claim, plaintiff asserted that a number of

prison officials "spread rumors about him, slandered his name, 'drilled' into inmates'

minds that he was a 'snitch,' and told inmates that . . . [they] needed to stab Plaintiff."

*Id.* at *8.  The magistrate judge found that, although plaintiff had "alleged some context

in terms of the timing and location of the alleged communication, it remains unclear

what specifically each [defendant] . . . communicated to inmates, and when and where

each of those conversations occurred." *Id.*  Because plaintiff had not alleged "exactly

*who* is alleged to have do[ne] *what* to *whom*," the magistrate judge found that plaintiff

had not alleged personal participation with respect to this claim.  *Id.* (citing *Robbins v. Okla.*, 519 F.3d 1242, 1250 (10th Cir. 2008) (emphasis in original)).  Plaintiff's claim is more analogous to the latter claim in *Guion* than the former.  Plaintiff alleges the date on which the incidents took place, but has not alleged any facts that make clear "exactly *who* is alleged to have done *what* to *whom*."  *Robbins*, 519 F.3d at 1250.

Finally, plaintiff cites the Tenth Circuit's affirmation of denial of summary judgment on a § 1983 claim based on excessive use of force in *Estate of Booker v. Gomez*, 745 F.3d 405, 421 (10th Cir. 2014).  Docket No. 59 at 6-7.  In that case, the Tenth Circuit stated that, where appropriate, it is permissible to "aggregate[] officer conduct" in excessive force cases.  *Id.* at 421.  *Estate of Booker* is inapplicable to the Denver police defendants' motion.  *Estate of Booker* concerned a claim that five police officers used excessive force against a man who was arrested for failure to appear at a hearing regarding a drug charge, resulting in the man's death.  *Id.* at 409.  In the relevant portion of *Estate of Booker*, the Tenth Circuit held that, at the summary judgment stage, it was proper for the district court to consider whether the conduct of the five officers as a whole constituted excessive force rather than considering each officer's actions in isolation.  *See id.*  *Estate of Booker* does not discuss, and has no relevance to, the specificity with which a § 1983 plaintiff must allege the personal participation of each defendant in an alleged Constitutional deprivation.  Even if *Estate of Booker* were relevant, it would only further underscore the deficiency in plaintiff's pleading: in finding that aggregating the conduct of multiple officers was appropriate, the Tenth Circuit's decision cited evidence of each officer's active participation in the

challenged use of force.[6]  Because plaintiff has not alleged the actions of each of the

Denver police defendants with particularity, plaintiff's claims against the Denver police

defendants in their individual capacities will be dismissed.

The Court now turns to whether plaintiff has stated a claim against the Denver

police defendants in their official capacities.  "[F]or purposes of analyzing a

municipality's potential liability under § 1983, acts of municipal department officials in

their official capacity are equated with the acts of a municipality itself."  *Stump v. Gates*,

777 F. Supp. 808, 816 (D. Colo. 1991) (citing *Monell v. Dep't of Social Servs.*, 436 U.S.

658, 690 n. 55 (1978)).  To state a § 1983 claim against a municipal employee in his

official capacity, a plaintiff must allege:

> (1) The existence of a continuing, persistent and widespread practice of
> unconstitutional misconduct by the [municipality's] employees;
>
> (2) Deliberate indifference to or tacit approval of such misconduct by the
> [municipality's] policymaking officials . . . after notice to the officials of that
> particular misconduct; and
>
> (3) That the plaintiff was injured by virtue of the unconstitutional acts
> pursuant to the . . . custom and that the custom was the moving force
> behind the unconstitutional acts.

*Gates v. Unified Sch. Dist. No. 449*, 996 F.2d 1035, 1041 (10th Cir. 1993).  A single

incident is generally insufficient to show municipal liability, unless the plaintiff can show

that "the particular illegal course of action was taken pursuant to a decision made by a

person with authority to make policy decisions on behalf of the entity being sued."  *Moss*

---

[6]*Id.* at 422 ("Deputy Grimes applied the carotid hold; Deputy Gomez helped handcuff
Mr. Booker; Deputy Robinette handcuffed him and applied pressure to his back; Deputy
Sharp applied the OPN; and Sergeant Rodriguez used the taser.  If excessive force
occurred, all deputies contributed to it.").

*v. Kopp*, 559 F.3d 1155, 1169 (10th Cir. 2009). Plaintiff argues that his allegations "demonstrate the existence of an unlawful policy, custom, or practice" because they claim that "multiple DPD agents violated [p]laintiff['s] free speech rights on multiple occasions by making the affirmative choice to silence [p]laintiff[] and retaliate against [him] based on the content and viewpoint of [his] speech." Docket No. 59 at 26. The Court disagrees. First, as previously discussed, plaintiff has not identified a "continuing, persistent and widespread practice of unconstitutional misconduct" by the Denver police defendants because plaintiff never alleges what specifically the Denver police defendants did. Second, even if plaintiff had alleged widespread unconstitutional misconduct, plaintiff does not point to any allegations tending to show deliberate indifference to or tacit approval of this practice by the municipality's policymaking officials. Thus, plaintiff does not state a claim against the Denver police defendants in their official capacities.

Because plaintiff fails to satisfy the threshold requirements to state a claim against the Denver police defendants in either their individual or official capacities, the Denver police defendants' motion will be granted. The Court need not and does not reach the issue of whether the parking lots adjacent to Sports Authority Field are a public forum, whether plaintiff's speech was political or commercial, and whether, if commercial, the speech was nonetheless entitled to protection.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that defendant Stadium Management Company, LLC's Motion to Dismiss Amended Complaint Under Fed. R. Civ. P. 12(b)(6) [Docket No. 41] is **GRANTED**.  It is further

**ORDERED** that defendants Tom Sherwood, Raul Velasquez, Tony Lopez, and Ron Thomas's Motion to Dismiss [Docket No. 54] is **GRANTED**.  It is further

**ORDERED** that plaintiff's first and second claims for relief are dismissed with prejudice.  It is further

**ORDERED** that, within 14 days of this Order, defendants may have their costs by filing a bill of costs with the Clerk of the Court.  It is further

**ORDERED** that this case is dismissed in its entirety.

DATED March 8, 2016.

BY THE COURT:


 s/Philip A. Brimmer                              
PHILIP A. BRIMMER
United States District Judge